Please call the first case. Joshua Glassock v. Sig Sauer. Thank you. Mr. Phillips. Good morning, Your Honors, and may it please the Court. My name is Carter Phillips. I represent Sig Sauer as the defendant-appellant in this case. While we have raised a number of errors that the district court committed in certifying the class in this case, I'd like to focus on two of them in particular today, because both of them conflict pretty dramatically with this circuit's precedents in ways that warrant the reversal of the class certification decision in this instance. The first one is the question of standing, whether there's been injury in fact within the meaning of that term as this Court has defined it in product liability context. And then second is the question of predominance. Speak up for me. I apologize, Your Honor. I'll try to speak more directly into the microphone. And the second one is predominance, where this Court has held under the MMPA that as a fraud-like piece of litigation, predominance is a real serious problem because most of the claims will be individualized and not appropriate for class certification. To go back to the standing issue and the question of injury, in fact, this Court has ruled in a series of cases, Johanson, Polaris, Breal, and the statement in Penrod, that in any kind of a case in which it's a product defect case, there has to be a manifest defect. That is, whatever the problem is has to have actually been experienced by the individual plaintiff. And if the plaintiff has not experienced that defect, then it has no basis for going forward with the litigation. What about the Peck's plumbing case, where you do have some cracking, but maybe the homeowner doesn't even know it, and that's what caused any kind of damage to the home? Right. But the cracking itself is a physical manifestation, so you have the manifest defect under those circumstances. The key to this, it seems to me, is not whether there might have been some kind of harm, in a sense. I mean, this Court has rejected the – I mean, the problem is it's not an ascertainable loss within the meaning of the MMPA or within the meaning of injury, in fact, when you're talking about simply the risk that the defect will happen. Here, in that case, it was more than a risk. It actually happened. The extent of the injury is another question, but the fact of the injury is clear. Here, there is no injury because the Court has rejected the idea of the benefit of the bargain theory as a basis for asserting injury in fact. And what the plaintiff got here is exactly what the plaintiff wanted. He knew at the time he bought it that it didn't have a safety. He knew when he bought it that as soon as he put the magazine in, pulled the slide back, the gun was ready to fire. And he knew it had a relatively light trigger finger. Not unusually light, but a relatively light trigger finger. And as he testified in his deposition, it never inadvertently discharged. That's the only defect that's really involved here. Does this gun inadvertently discharge? Never happened to him. Candidly, I don't think it's ever happened to anybody without somebody pulling the trigger. But in any event, it hasn't happened to him under these circumstances. And where he has not, in fact, been affected by the defect, he does not have standing in order to bring this action. And obviously, he doesn't have standing to bring it on behalf of other class members as well. But even if he had, in fact, been injured in some way in this case, or the court wanted to get a slip slide past the standing issue, the predominance issue from this Court's decision in Folgers defeats the class certification choice that the district court made here. Because in Folgers, what the court said is that fraud cases or fraud-like cases, which an omission case under MMPD is, are not cases that are suitable for class treatment. The individual issues will inherently overweigh the class treatment. Why? Because questions of causation and materiality are questions of consumer choice. And here, the choices of the consumers, as we know from the record, and it's undisputed, vary widely. Most people prefer a gun without a safety. Three-fourths of the guns sold by SIG don't have a safety. Most purchasers prefer a lighter trigger. Most purchasers, because they buy this kind of a gun, want a gun that's ready to fire as soon as it's chambered and ready to go. So there's no basis on which to say everyone will react exactly the same way or that predominance will apply. This Court rejected the district court's... Could a really light trigger finger or trigger pull, could that be... At what point could that become a manifest defect? Would your position be that it has to actually accidentally discharge, or could someone have the fear, oh, my gosh, if I drop this gun, it might discharge and hurt somebody? Well, I mean, you could... I don't think having that fear would be sufficient because a lot of people presumably, at least on a class certification basis, you'd still have a situation where presumably a significant number of people might still prefer to have the lighter trigger pull just simply because their circumstances are such. I mean, remember, these are sold to a lot of police and law enforcement agencies, and they probably want that gun to go off more easily and with greater accuracy perhaps than the average consumer. And the truth is you can't, you know, you just can't generalize from it. Well, the fear that if the weapon is dropped, it might go off, that's really a healthy fear, isn't it? Yeah, to be sure. That any gun owner should be cognizant of. Right. Common sense will tell you that you would prefer that your gun not go off if you drop it. And the truth is there's no question in this case about dropped guns, but we do know that SIG specifically adopted a voluntary program to prevent guns from going off under those circumstances. And that's the bottom line in this particular case. I mean, it's a product defect case in which there's no real product defect. Did SIG, did they advertise in some way that, hey, there's a really light trigger pull here, or is that something that the consumer had to find out on their own, so to speak? Well, we described it as a crisp pull, which the plaintiff inferred, at least from his testimony and deposition, that that meant it was relatively easy, but he didn't actually view that as a negative. And the truth is, you know, one, it's within the range of what the industry standards are. I mean, there are, to be sure, lighter pulls. There are, of course, heavier pulls. But as I said earlier, a lot of police departments prefer a lighter pull because, candidly, they're more accurate. But it goes to the core point as to why these cases really can't be handled on a class-wide basis, because you don't know, does somebody want a heavier pull or a lighter pull? What statements are going to help in an individual case? Would it be material to that individual plaintiff under those circumstances? The same with fully energized and the same with whether or not it has a safety or not. Is this model of handgun available with a safety? Yes. This model is available with a safety. Is that significant, that that option is available? Yes. Of course it is, because that, I mean, in this particular case, it probably doesn't ultimately make any difference because the plaintiff knew it didn't have a safety and bought it with that understanding. But, obviously, the option was available to him to either do one of two things. One, he could have declined to buy that gun, bought another one that does, in fact, have a safety. Or, two, he could have paid for a kit and put the safety on himself or have somebody put the safety on himself. Obviously, he chose neither of those courses under these circumstances. I mean, it is interesting. I wouldn't make much of it. But the reality is he doesn't actually want the relief that the complaint asks for, because the complaint says pay less for it or have the kit installed to put on the safety. He doesn't want a safety, and he wouldn't take less money. He just didn't want to buy the gun, or that's his theory of the case. He didn't want to buy that gun. But the truth is the vast majority of the members of his putative class would have wanted the gun for exactly the features that he now identifies as a defect. I would hope this quote would say, look, you can't simply go and tick off two, three, four features of a weapon and say, in the unique combination, this somehow creates more of a risk than would otherwise exist, especially if you start off with the safety. Obviously, in certain circumstances, a safety will be, by definition, it creates safety. But that doesn't mean that it's unreasonable for a consumer to prefer to have a gun that doesn't have a safety, because there are a lot of circumstances in which, in fact, they will be safer without that particular device on it. And I think the district court simply blew by all of that in a way that, one, there was no standing. This is not the right plaintiff. This plaintiff has no claim to begin with. And second, he certainly can't represent the class under these circumstances. And unless the Court has further questions, I would sit down. Thank you, Your Honors. Mr. Wertz? Yes, sir. Good morning. May it please the Court. My name is Todd Wertz. I represent the Plaintiff Appellee, Josh Glasscock, in the class in this case. I want to address a number of the points made by my friend. But before I do that, I want to explain why Judge Harpool correctly certified this class. You mumbled that. I didn't hear a word at the end. I'm sorry. I want to tell you why Judge Harpool is right, perhaps unsurprisingly. I take this from not our firearms expert, but Sig Sowers. On page 722, Sig Sowers' appendix, page 17 of Derek Watkins' report, makes the point, just as a statement of fact, that for the last thousand years, the paramount concern in a firearm is controlling the discharge. This is the critical material fact in a firearm design. The issue in this case is not whether or not this case has a manual safety. That's part of it. The issue of the defect with the P320 in particular, and when does it manifest? That becomes the critical issue, of course, in this case, is when you combine three design elements that Sig Sowers has chosen. Whether or not it has a manual safety, yes, that's obvious. Whether it does have a light trigger pull. If you handle it, you probably can figure that out. The critical part is that it is fully energized when it is around its chamber. That's a different concept than what my friend described, that the gun's ready to fire when around its chamber. In Ben Gattrose, our firearms expert's unchallenged report, he lists a number of firearms that have other features, double action is one way, or heavier trigger pull, that you can make the gun safe, that it's ready to fire when chambered. But at least with regard to your first and third thing, that's pretty common to not have a manual safety. Glocks don't have manual safety. There's a number of firearms that don't. And to have it fully energized, that's what happens when you put a round into a glock or other such things. And so really, that's why I was asking about the trigger pull. I think this comes down to the trigger pull. Am I wrong about that? Maybe in light of some of these other things. I have to disagree with Your Premise, Your Honor, candidly. The evidence is that, for instance, the glock is only about 50 percent energized when you chamber it. It's not energized. It does not have enough energy to discharge the round. And this is an important point because when I took the deposition of Matt Taylor, the lead designer on the P320, we talked about the energized state of the 320. And he said that could a consumer tell that it was energized by looking at it? No. By handling it? No. Firing it? No. Disassembling it? No. Our expert, Ben Getrost, is a federal law enforcement officer with the Department of Homeland Security, a certified firearms instructor. He was surprised to learn. He was trained on the P320. He's himself fired 5,000 rounds down it. He was surprised to learn how heavily energized it is. What does fully energized mean then? Because when you put a round in a chamber of a glock and then pull the trigger, it goes. Absolutely. And so my question is what's different from, say, a glock or a Springfield or one of these other brands? Of course, Your Honor. This gets into the technicalities of it, and we're kind of deep in the merits now, but it's appropriately so. When you pull the trigger on the glock, it's going to move the striker back the rest of the way, a sufficient way to discharge a round. In its inert state, the testimony is that the glock does not have enough energy in the gun to fire it. The thing about the P320, and think of a revolver as a simpler design, that if a revolver, if the hammer is closed, it's an inert device. It does not have enough energy to strike that primer. So the first thing you have to do is move the hammer into the back position. Sometimes that can be done with a trigger, through a heavy trigger pull. We're kind of the old cowboy style of doing it with your thumb. And at that point, it's energized. And that's what the P320 is, is that it is the functional equivalent of a revolver with a hammer lock back, which you just throw in your holster and carry around all day. And no consumer that I have ever spoken to, a law enforcement officer, and given that example, wants to sign up for that. This is a very material aspect. In six hours' response, I would tell them most of the stuff. But the issue with the three-part defect, and this is what makes it so deceptive, is that I liken it to the concept of bleach and ammonia. Both are perfectly good cleaners until you put them together, and now you've created a chemical weapon. That's the nature of these design features that Sig Sauer has created. Now, they sell this gun to the military. The military puts a safety on it. Sig Sauer performed what's called an FMECA, an analysis of this gun. And that analysis is important. It's one of the things that makes us like CERN, because it says that the P320 and its base design, that every unit is likely to go off over the lifetime of its gun to have an unintended discharge. To be sure, not every unintended discharge puts a hole in somebody's leg and causes a personal injury. Our expert, Ben Gattrose, talks about discharges that he saw and has experienced himself on a firing range. What about, you know, I want to just kind of steer back to the standing a little bit. The plaintiff here, the name plaintiff. Of course. So in the record are all the things that Mr. Phillips talked about. The fact that, you know, he knew, kind of knew what he was getting. He wanted what he was getting. He even, I think he bought it from somebody who had a baby or a young child who said, I don't want this gun because it, you know, might go off. And so you kind of have a problem, at least from the reliance standpoint and the materiality standpoint in terms of your name plaintiff. I'm not sure he has standing in light of these facts. Tell me why I'm wrong. Absolutely, Your Honor. Particularly under MMPA precedents. Of course, Your Honor. Which are quite, quite strict. Of course. And I would commend the Tucker opinion to this Court to address both the MMPA and the standing issues. But in particular, as to the reliance, reliance is not an element of the MMPA. I mean, it's very clear under Missouri law and under binding regulations. And it bears noting that the regulations in Missouri are not like federal regulations where it's this complicated deference standard. Under Missouri, properly promulgated regulations like this are binding on courts. And there's just no reliance. Second, as to Mr. Glasscock wanted a gun without a manual thumb safety. That's what he wanted. But he had no way of knowing the other factors to the defect. He has standing under this defect. He did know part of it. But he didn't know the whole thing. And that's clear in his deposition. I believe in his second deposition. He was deposed twice. He said, I need to know that. Because now that he knows, he's put the gun on the shelf. He's harmed. He can't use it. He feels that he can't use it. He can't sell it because it doesn't feel right doing that. That's an economic harm. Now, is he being reasonable in that? That's one of the elements of the MMPA, is that the consumer has to be reasonable at all times. That's a question for the fact finder. On the can't sell it. So one of the theories you have is the benefit of the bargain sort of theory.  Does that work? I mean, does it work to say, I won't sell it because I feel bad about it? That seems like a diversion of resources sort of Hippocratic medicine type of thing, where you're making a personal choice not to sell it. So does that undermine that claim? I don't think it undermines it. But I also don't think it can underlie the claim, to be fair, Your Honor. Because the benefit of the bargain, getting down to liability and damages are, of course, different concepts. We have to prove the five elements under jury instruction 3902. I'm a bit of a country lawyer about this. And we prove liability. Now we've got to assign damages. Damages under the MMPA are a benefit of the bargain. There's different ways to calculate that, Missouri courts and federal courts applying the MMPA. We've done it very thoroughly. Yes. And that's binding on our panel. Of course. Our definition of how we think the Supreme Court of Missouri would apply their benefit of the bargain ancient principle. I agree with that. And I think cost of repair is one of the ways to do that. This isn't a price premium is a term that is in the defendant's brief. That's not what this is. We're saying, what would it cost to bring this gun to resolve the undisclosed defect? No, it's not a cost issue. It's the benefit question. Yes. And, Your Honor, the benefit is that he has a gun. He has something. As Mr. Carter said, my client would like to have a refund. That's not allowed under the law. He's not the first litigant to have a righteous claim that is entitled to a more limited remedy than what he may choose. And the way that we suggest measuring the benefit of the bargain is what would it cost to bring this gun to what a reasonable consumer would have expected? Because from Mr. Watkins' observation that the paramount concern of firearm design is controlling the discharge, that that means that this gun has two core functions that logically follows. One is to discharge every time the trigger is pulled and to never discharge unless the trigger is intentionally pulled. And we believe there's common evidence where a jury could find that this gun cannot satisfy that second function. That's why Mr. Glasscock is upset about his purchase. We believe that a jury could find that that is material to every consumer. This isn't the Folgers case where we're talking about who likes their coffee strong, who likes their coffee lighter, or... He had buyer's remorse. I'm sorry? He had buyer's remorse. Well, he regrets buying the gun not knowing all the facts. But, you know, that's the nature of an omissions case, Your Honor. Well, he maybe didn't study the difference between half and fully energized. He knew everything else. Well, Your Honor, we require our consumers to be reasonable. Nothing happened to him that was unexpected. He has a gun that cannot satisfy his core function, Your Honor. This is a Zern and a Megaflex. He doesn't have to have an unintended discharge. A house didn't have to blow up. But on Zern, Mr. Phillips was right that there was a crack, there was a manifest defect. And I understand this gun to be perfectly operable as it was intended to function. In other words, it's not as if there's a crack down the barrel. It's not as if the trigger is falling off and, you know, it operates as it's supposed to. And so doesn't that make that a little different than the Zern case? No, Your Honor, for two reasons. One, in Zern, the cracks weren't present until you added water, just to be clear. It's a metallurgical problem. Water was a necessary antecedent, but it was going to happen because it's a pipe. So that court followed with that. But the second thing is that the defect is not a discharge. The defect here is that it has this combination of safety features that renders it incapable of being trusted to not discharge until you intentionally pull the trigger. And we have all the evidence from various other incidents, videos of incidents where this gun is going off. I mean, one of the videos that's in our briefing, the law enforcement officer has his hands on a suspect's ankle at the time the bullet shoots backwards. Okay, there is, the court had before it the jury verdict in the Lang v. Sig Sauer case from the Northern District of Georgia, which was a personal injury case stemming from one of these, where a jury found the gun was defectively designed. This is a gun that has material problems. And the nature, I'm sorry, did you have a question, Mr. Shepard? The, it is an inherently dangerous device. That's part of the point. But that doesn't mean that consumers of a firearm, that a merchant or manufacturer has any less responsibility. In fact, morally probably more so. But legally, they're required to share the facts that it knows that would be material to a reasonable consumer that a consumer could not know. Because, of course, to Judge Loken's point, well, should he have done more research, the lead designer said he couldn't have figured it out. You know, absent just being an engineer and taking the thing down well past field stripping it, this is a very concealed feature to the P320. You know, I just want to ask one additional, at least one additional question on standing. But if we're not, if benefit of the bargain doesn't necessarily hold this lawsuit up by itself, doesn't this become, what we were discussing with opposing counsel, really a question of fear? That he has a fear that something bad might happen in the future. Because it's not really an economic injury anymore. It's more about the accidental discharge of the possibility of it. I wouldn't say that it's an either or, Your Honor. I would say that he probably has fear. Fear is not compensable under the MNPA. So that would not be redressable under the MNPA. And so the issue gets into the value of what he got. And this is just a classic. He thought he was getting a perfectly good gun with a manual thumb safety that he could trust and use in his everyday world. This isn't that. And there's evidence by which a jury could find that this gun is not that when it comes without a manual safety. That's not to say every gun needs a manual thumb safety. This one does because of the way Six-Hour designed it. And if there's not, I do want to talk about Judge Harpool's order beyond the standing issue. The issue, our standard at Rule 23 is for the court to perform a rigorous analysis. And that's reviewed under an abuse of discretion standard. After discovery, as in this case where we did some discovery, this court has held that it's a heightened amount of deference that we give to the trial court. Here, Judge Harpool went through every single factor. He marched through them methodically, including commonality, which Six-Hour didn't even challenge. Nevertheless, he still reviewed it. At each step, he reviewed evidence. Yes, he referenced the allegations in the complaint as he should. The complaint performed a role. It's pretty hard to say the Supreme Court's Rule 23 decisions in the last 25 years are great deference to Rule 23 analyses by district courts. I mean, it's just you can say it in the law, can say it in the abstract, but it ain't true. I would agree that we seem to be giving a little less deference, but we haven't changed the standard of review. Maybe I'm asking for something I don't want here. But the fact of the matter is it's a procedural ruling that it's a range. And particularly on an interlocutory appeal, as we are here. Because one of the things about an interlocutory appeal is we don't have a complete record for you. This case, like a lot of cases, we bifurcated discovery at the outset. We did enough certification discovery. We served one deposition notice. They put forward five witnesses, but we only served one notice. We got the basic documents, and we bothered much for class certification. On predominance, you know, there's going to be a lot of individual facts that make a difference. And maybe you can argue it's not predominance, but, you know, was it material? How much was each person told? Where did they find it from in the class? Did they see it on TV? Did they get it in the instruction manual? Did the gun shop owner tell them? Some people will know more or less than Mr. Glasscock did. Those are all things that bear on an MMPA claim. So, you know, you might have commonality, but even as the harm to the defect, there might not be because the gun could have accidentally discharged or it might not have accidentally discharged. It seems to me like there's a lot of uncommon issues that have to be worked out to get a class. The standard on the MMPA is the reasonable consumer standard. You know, in the 2020 amendments, the legislature dialed back the MMPA a little bit. The old cases would say that it was the broadest possible to resolve everything, you know, any hurt feelings. And one of the ways we did that was to, we now look at the reasonable consumer. We don't indulge the hypersensitive of the world. Was this something that would cause a reasonable consumer to enter into the transaction? Do we consider, though, what somebody was told? In other words, like if he goes to the gun shop or calls somebody, customer service for SIG, and says, hey, tell me all, I want to know the ins and outs, and is told it's fully energized, light trigger pull, no manual safety. Oh, that's great. That's exactly what I'm looking for. Don't we consider that in the reasonable consumer that you were told all of these things and knew it before you bought it? You might have thought it was possible to have happened. SIG Sauer has been very clear that no one could tell and that they haven't. It's the nature of an omissions case as opposed to an affirmative representation case like the Folgers case. In an omissions case, it's undisputed that SIG Sauer has not disclosed the fully energized nature of the P320 anywhere. And it certainly has not disclosed the impact of having those things combined. So you're saying no one knew about the fully energized feature? There's absolutely no evidence that anyone knew. You know, the name plaintiff didn't know. The designer said no one could know. And our firearms expert indicated that he's one of the most sophisticated users of this gun. He didn't know. There's evidence here that the jury could find that no one could know. Well, I think I hear you saying, and correct me, but I think you would agree that there is a significant subset of purchasers that the light trigger pull doesn't bother them. In fact, they might desire it. The lack of a manual safety is not a deterrent to purchasing. That gets us down to the fully energized feature. And are you saying that there is no subset of purchasers that would knowingly purchase the weapon with full knowledge of that? I am saying, Your Honor, that there is. That might even be a desirable feature to a subset. I suppose that is a hypothetical. There's certainly no evidence of that. And what there is definitely no evidence of is that there's any subset of purchasers that would want to purchase this gun. But that's a basis for denying overbroad class certification. The existence of subsets that would be more, that would have more commonality and predominance. I agree if there was any evidence of such subsets existing, but this is a hypothetical of which there is no evidentiary support behind it. And to finish my point briefly, Your Honor, there is certainly no evidence that anyone would want to purchase this gun with this combination of features, particularly not knowing the impact of this combination. And so with that, Your Honors, I would ask this Court to review the fulsome and rigorous analysis by Judge Harpool and either affirm this order as written or, in the alternative, the Court could vacate the order granting Sig Sauer leave to file this appeal in the first place and dismiss as improvidently granted. To say that last what? Your Honor, this is an interlocutory appeal. The Court has authority to dismiss the appeal. You don't have to reach the merits of it if you find it was improvidently granted leave to appeal. Is that briefed? It is listed as one of our alternative remedies that the Court has. Okay, not like, all right. Thank you, Your Honors, for your attention. Thank you. May it please the Court, I will try to be brief. I think it's worth noting at the outset that the concept of, quote, highly energized is a new concept. I mean, it's not surprising that there are not a lot of disclosures using the term highly energized. That's something that the Plaintiff's Counsel has dreamed up. But with respect to the basic point, which is that if you have put your, you know, get your firearm ready to fire, right, and the bullets are in the chamber, chamber's in the gun, this is what the disclosures are. Do not load a round into the chamber until you're ready to use the pistol. And when a user has pulled back the slide, the chamber or cartridge, the pistol is now loaded and ready to fire, and the cartridge will discharge if the trigger is pulled. This is exactly what the purchaser wants under these circumstances. Fully energized, Judge Strauss, is simply the flip side of the trigger pull itself. If it's fully energized, the six-and-a-half pound of trigger pull will fire it. If it's not fully energized, it might take eight pounds of trigger. But either way, the trigger pull is well within the standards that you would normally expect, and there's nothing, not even an inherent defect in that. It's simply a question of the preference of the consumer. And regardless of that, what we do know from this point, if at least on the question of standing, is that he never had any problem with the weapon for the 200 and plus times when he used that weapon to fire or to discharge his weapon. I wasn't surprised. As far as actual matter, does the record contain any information as to whether the weapon will discharge without the trigger being pulled? Our expert witness said that that is impossible, that you cannot have a discharge without some form of trigger pull. It could be unintentional in the sense that you may pull the trigger without actually intending to pull it under certain circumstances. No doubt about that. And that's true of any firearm, to be honest with you. Well, I thought I heard counsel refer to a video in evidence of a law enforcement officer's weapon discharging. Yeah. It was maybe still in the holster. Well, I would argue that, you know, out of context is one thing. In context, that would probably be something very, very different. But even if there were a case like that, and I don't think, frankly, that the facts will bear that out as it plays through that litigation, this would be a case of the point of trying to piggyback off somebody else who would, in fact, have a legitimate claim. And that's exactly what the court said. You cannot do in these kinds of cases that you have to suffer the actual injury. It doesn't mean you have to actually be shot or physically wounded, but you have to have experienced an unintended discharge. I mean, I get that the plaintiff tries to run away from the unintended discharge as the defect in this case. But at the end of the day, that's the only defect that can cause any kind of injury that's compensable. What about the benefit of the bargain? I bought this gun for $300. I think it's probably worth $225 because people have found out this gun is no longer any good. That would be the theory. And this court has rejected that theory over and over again. I bought the crib because I thought it would be good to use with my baby. It sometimes falls down. It's not the crib I thought I was going to get. I bought this ATV because I thought it was going to, you know, zoom along. It overheats. I never imagined it could catch fire. I didn't want it. This court has over and over again said that's not the basis for standing. What you have to do is actually experience the defect. At that point, you then have injury. But, of course, you're still going to have to go and prove and demonstrate causation, et cetera. And, of course, you know, the plaintiff is never going to be able to do that. To go back to another question Judge Strass, obviously every plaintiff in this punitive class is going to have different information, different preferences. They're going to make very different judgments. This is not a case in which class certification works at all. So I would urge the Court in the first instance to find that there's no standing. In the second instance to find that this is inherently not a class certifiable case and reverse the decision of the district court. If there are no further questions, I'll give you back some of your time today. Thank you, Your Honors. Thank you, Counsel. It's been thoroughly briefed and arguments have been helpful, as always. And we will take it under advisement.